
Filed
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**GLENN SIGUENZA SANTOS,**
Defendant-Appellant.

Supreme Court Case No.: CRA19-016
Superior Court Case No.: CF0104-18

## OPINION

## Cite as: 2021 Guam 12

Appeal from the Superior Court of Guam
Argued and submitted on January 29, 2021
Via Zoom video conference

Appearing for Defendant-Appellant:
Peter C. Perez, *Esq.*
Law Office of Peter C. Perez
DNA Bldg.
238 Archbishop Flores St., Ste. 802
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Woodrow D. Pengelly, *Esq.* (briefed)
Courtney L. Scalice, *Esq.* (argued)
Assistant Attorneys General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913

**E-Received**
10/14/2021 1:40:28 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**CARBULLIDO, C.J.:**

[1]     Defendant-Appellant Glenn Siguenza Santos appeals a final judgment of conviction under 9 GCA § 25.15(a)(2) and (b) of First Degree Criminal Sexual Conduct (As a First Degree Felony), and under 9 GCA § 25.20(a) and (b) of Second Degree Criminal Sexual Conduct (As a First Degree Felony).  Santos argues that the trial court erred by admitting certain expert testimony of a Sexual Assault Nurse Examiner, by failing to grant Plaintiff-Appellee People of Guam's ("People") request for a mistrial following an outburst by the victim in the presence of the jury, and by admitting testimony of prior uncharged sexual conduct allegedly perpetrated by Santos against the victim.  Santos also claims that certain remarks in the People's closing argument violated his Fifth Amendment rights under the Constitution, his rights under the Organic Act, and other statutory rights, requiring reversal of his convictions.  We affirm the convictions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

[2]     Santos was charged with First Degree Criminal Sexual Conduct ("CSC") by intentionally engaging in sexual penetration of S.A., a minor.  He was also charged with Second Degree CSC for the same incident.

[3]     At the time of the incident charged, S.A.'s mother was in a romantic relationship with Santos and lived with Santos in his home.  S.A.'s mother had joint custody of S.A. and S.A.'s brother, and S.A. lived with her at Santos's home during the weeks she had joint custody.  S.A. reported she was sexually assaulted at Santos's home during the early morning of February 17, 2018.

**[4]**     The People called seven witnesses at Santos's jury trial, including S.A. and S.A.'s mother. The jury heard testimony from the police officer who took the statements of S.A. and her mother on the morning of February 17, 2018, and from the officer who took the statement of Santos that same morning. The jury also heard expert testimony from Sexual Assault Nurse Examiner (SANE) Amparo Rios, who conducted a genital exam of S.A. at Healing Hearts Crisis Center, a service of the Guam Behavioral Health and Wellness Center.

**[5]**     S.A. testified that Santos had digitally penetrated her vagina in the early morning of February 17, 2018, while she slept in the room she shared with her brother at Santos's house. S.A. testified that she, her brother, her mother, and Santos had attended a rosary the evening before the incident and that Santos had been drinking at the rosary. S.A. further testified that she and her brother went to their shared bedroom upon returning to Santos's home after the rosary, where S.A. eventually fell asleep.

**[6]**     S.A. testified that the next thing she remembered was Santos's hands touching her and that her pants were being taken off. S.A. testified that she could see Santos's face in the light coming from the hallway through a hole in the bedroom door. S.A. said that she was touched on her "private area" and that Santos spoke to her. Transcript ("Tr.") at 76–78 (Jury Trial, May 1, 2019). She testified that Santos was using his finger to penetrate her and she could "feel his nails kind of hurting [her] insides." Tr. at 4 (Jury Trial, May 2, 2019). She stated that he was using one hand to touch her and his other hand to touch himself. S.A. testified she was too scared to call out for help or wake up her brother, who was sleeping nearby, because she was afraid that Santos would threaten her or her brother. After Santos left the room, S.A. said she went to tell her mother, who was sleeping in the room her mother shared with Santos.

**[7]**      After S.A. told her mother, S.A.'s mother confronted Santos, and both agreed that all three would go to the police station.  The police officer who took Santos's oral statement that morning testified that, according to Santos, after the rosary and once everyone else had gone to bed, he went outside to make himself throw up because his head was spinning.  The officer also testified that Santos said he went outside to smoke marijuana, though this was not reflected in Santos's written statement.  The officer testified that Santos stated he only went back inside the house once he saw the lights turn on from inside the room he shared with S.A.'s mother.

**[8]**      Several times during S.A.'s testimony, S.A. stated that Santos had abused her on previous occasions.  While S.A. was testifying about the specifics of the incident charged, she volunteered that the incident was not the first.  The People later revisited the statement, asking S.A., "Earlier you testified, you said this wasn't the first time, is that correct?", to which S.A. responded, "Yes." Tr. at 15 (Jury Trial, May 2, 2019).  S.A. testified that the first incident occurred while she was in seventh or eighth grade and that the abuse had continued until the charged incident—a period of several years.  The People asked S.A. whether she could recall how many times per year Santos would touch her, to which S.A. responded, "When I'm with my mom and I spend the night at my mom's, it's -- sometimes it would be almost every night at my mom's were [sic] once or twice. . . . It would happen when I'm at my mom's, around this -- those numbers." *Id.*  When asked by the prosecution for specifics of the prior incidents, S.A. replied:

> I can't remember specific dates. But whatever happened to me, I've tried -- tried -- since we fully reported him into the police, I've tried -- one summer, and when these past months in school, to forget.  But I can't forget the feelings of him touching me.  I can't forget the memories, flashes of my memories, which -- so nightmares every night.  I'd even freak out when people come up to me at school. Sometimes my friends want to like scare me from behind.

*Id.* at 16.  This was the extent of the testimony the People elicited about these prior incidents.

**[9]**     On cross-examination, Santos's trial counsel tried to clarify S.A.'s testimony on the frequency of the prior incidents, asking, "Did you tell the police that [the sexual assaults occurred over] the last six years, three or four times a year?"[1]  *Id.* at 49.  Eventually, S.A. responded: "Three or four times a year.  More like three or four times a week, when I'm with my mom."  *Id.*  Defense counsel asked, "So how many times, I'm going to ask you one more time, how many times you're claiming that previously it happened?"  *Id.* at 50.  S.A. replied, "Sometimes three or four times a week, sometimes, I don't know, whenever he feels like it."  *Id.* at 51.

**[10]**     At no time during S.A.'s testimony about the prior incidents did the defense object.  The trial court did not conduct any inquiries, make any findings, or request a showing of relevancy at any time during S.A.'s testimony relating to the prior incidents.  Only after S.A. was done testifying  and was dismissed did the parties approach the bench to seek a formal stipulation under Guam Rule of Evidence ("GRE") 413, relative to S.A.'s testimony about the prior incidents.  The written stipulation was filed the next day and stated that the evidence of prior incidents of uncharged sexual conduct was admissible under GRE 413.

**[11]**     The defense's cross-examination of S.A. was rigorous and often contentious.[2]  During Santos's second day of cross-examination, S.A. requested a break, and the trial court granted a brief recess.  After the judge had left the bench, but while the jury was still present, S.A. made an outburst directed either toward Santos or his  lawyer.  The prosecutor approached the bench after the recess and explained:

>       After the court left the bench before the break, the victim stood up and said something, I'm not sure if it was directed to [defense counsel], or the defendant,

---

[1] The officer who interviewed S.A. on the morning of February 17, 2018, after the incident, did not testify about the frequency of the prior incidents.

[2] Additionally, the first day of S.A.'s testimony ended after an alleged incident between defense counsel and S.A.  The prosecutor informed the trial court of an incident that occurred when defense counsel had tried to prevent S.A. from leaving the witness stand without a marshal escort during a requested break in testimony.  This situation led the court to end the trial proceedings for the day.

but she said to the effect of, "I'm sorry, but fuck you." The jury heard it. The judge did not hear it, because the judge was already off the bench. I have some concerns about that. I think it may warrant a mistrial. If we look at *United States v. Perez*, 22 U.S. 579, the standard for that is manifest necessity.

Tr. at 61-62 (Jury Trial, May 2, 2019). The prosecutor commented that neither Santos nor his lawyer provoked the outburst. Defense counsel did not actively advocate for the grant of a mistrial, claiming that "[S.A.'s] outburst is her outburst. [The jury has] seen enough [of] her, that they can decide what she said on the record." *Id.* at 64. Defense counsel continued, "[I]t's [the People's] problem what she said." *Id.* Ultimately, the trial court did not grant the People's motion for a mistrial. The court admonished S.A., outside the presence of the jury, that she was not to comment when the jury was present in the court. Then, the court reconvened the jury and instructed that:

> While the court was not in session, that means when I left this courtroom a remark was made by the witness, [S.A.] . . . I'd like to admonish the jurors to remind you that any statements made in this courtroom when the court is not in session should not be considered by you as evidence, whatsoever, in this case and should not enter in your deliberations when you deliberate on a verdict of this case.

*Id.* at 70.

**[12]** Nurse Amparo Rios, testifying on behalf of the People, was qualified as an expert in sexual assault nurse examination, and she offered the only expert testimony during the trial. Rios testified about her findings regarding the genital examination she had performed on S.A., as well as to certain journal articles. Rios testified that S.A.'s genital exam was "normal," as it revealed no injuries or trauma to the hymen, but that this did not "confirm nor does it deny that anything happened to [S.A.]." Tr. at 48 (Jury Trial, Apr. 30, 2019). Rios performed the examination one month after the alleged incident occurred, and she testified that she did not expect to find any injuries based on the account of the incident that S.A. provided.

**[13]** The People asked Rios if she reviewed any literature or journal articles that may help them understand her findings, and Rios responded by discussing two studies in particular. First, Rios

testified that one study, the "Markowitz study," had analyzed prior studies and estimated the probability of finding injuries (called "findings") in sexual assault cases. *Id.* at 49. Defense counsel objected that Rios lacked the education to testify to this study because it was outside her field of expertise, stating that "she does not have the comprehension to read outside of that box," referring to the field of nursing. *Id.* The trial court overruled this objection.

[14]    Rios next testified about the "Kellogg study." She stated, "So with the Kellogg study, what they were looking for were . . . teens that had actually got pregnant, so -- and with these teens, they found out that they didn't have any injury to their hymen at all, although they had already had a child." *Id.* at 51. The People followed by asking, "So you are saying that after delivering a child, the hymen can still look like there're no physical findings to it?" *Id.* Rios replied, "Yes." *Id.*

[15]    On cross-examination, defense counsel asked Nurse Rios, "Can you tell me any studies that tells [sic] you, in one month that there's healing or regrowth or anything on the hymen? Within one month." *Id.* at 56. Rios replied, "There is a study from Markowitz that I just mentioned that if you have an exam within a certain period of time, so the 72 hours, you will find that, but after that, you have less of a chance to have any trauma. So healing will start immediately anyway." *Id.* at 56–57. Rios went on to testify that digital penetration inside the vagina can damage the hymen, but that she did not find injuries during S.A.'s examination. Defense counsel argued that it was counterintuitive that there would be no injury to the hymen if there was any penetration. Rios answered that finding no injuries would be "consistent with history based on the timeframe for healing." *Id.* at 63.

[16]    Although Santos's lawyer did not object to the Kellogg study when introduced, he later objected on hearsay grounds when the People sought to admit three pages of that study into

evidence during their redirect examination of Rios. The trial court admitted the three pages over defense counsel's objection.

[17]     Santos elected not to testify on his own behalf or offer any witnesses. During the People's closing argument, the prosecutor commented on Santos's lack of alibi: "Motive, opportunity, lack of alibi, and corroboration. Those are the things the criminal justice system wants. Okay. And we have all four of those things in this case." Tr. at 11–12 (Jury Trial, May 6, 2019). The prosecutor commented further: "Lack of alibi. He wasn't with another person. No one testified that they were with the defendant at that time period, he was alone, until it became with [S.A.]." *Id.* at 12. Defense counsel did not object during the People's closing argument. Defense counsel instead rebutted this argument about the lack of alibi evidence by suggesting that Santos had been outside the home when the sexual assault occurred.

[18]     The jury convicted Santos on both counts. For the charge of First Degree CSC, the trial court sentenced Santos to 30 years' imprisonment, with 10 years suspended. For the charge of Second Degree CSC, the court sentenced Santos to serve 20 years concurrently with the first sentence. Santos timely appealed.

## II.  JURISDICTION

[19]     This court has jurisdiction to hear appeals from a final judgment of the Superior Court under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-47 (2021)), 7 GCA §§ 3107 and 3108(a) (2005), and 8 GCA §§ 130.10 and 130.15(a) (2005).

## III.  STANDARD OF REVIEW

[20]     A trial court's evidentiary rulings are reviewed for an abuse of discretion. *People v. Perez*, 2015 Guam 10 ¶ 19. "[A] trial court's decision concerning the admission of evidence over a hearsay objection is reviewed under an abuse of discretion standard." *People v. Roten*, 2012 Guam

3 ¶ 13. "[W]here the trial court has abused its discretion in admitting certain evidence, the proper standard for evaluating whether reversal is required is the harmless error standard." *Id.* ¶ 41.

[21]    Plain errors affecting substantial rights may be noticed even though they were not brought to the attention of the court. *People v. Quitugua*, 2009 Guam 10 ¶ 10. On plain error review, we will not reverse unless "(1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process." *Id.* ¶ 11.

[22]    Waiver of a right precludes the issue from appellate review, while a forfeiture is subject to plain error review. *People v. Chong*, 2019 Guam 30 ¶ 9 (citing *United States v. Olano*, 507 U.S. 725, 733 (1993)).

[23]    When a defendant fails to object to prosecutorial comments, the standard of review is plain error. *People v. Mendiola*, 2010 Guam 5 ¶ 13.

## IV. ANALYSIS

[24]    Santos makes four arguments on appeal. First, he argues that Nurse Rios's expert testimony did not comply with GRE 702 and that her testimony about certain scholarly articles was inadmissible hearsay. Appellant's Br. at 36, 38 (Mar. 9, 2020).[3] Second, he argues that the trial court committed plain error in admitting testimony of prior incidents of uncharged sexual conduct under GRE 413 without performing the required "searching inquiry" announced in our decision *People v. Chinel*, 2013 Guam 24, and balancing under GRE 403. *Id.* at 48–50. Third, Santos argues that the trial court erred by denying the People's motion for mistrial, claiming S.A.'s outburst in the presence of the jury created manifest necessity for a mistrial. *Id.* at 39. Finally, he

---

[3] Santos also argues that "[t]he articles themselves were inadmissible hearsay." Appellant's Br. at 38 (Mar. 9, 2020). Presumably, counsel is arguing that the admission of portions of the Kellogg article amounted to an abuse of discretion. As discussed below, the trial court provided a curative instruction to the jury and instructed the jury to consider only Rios's testimony relating to the Kellogg article.

argues that the prosecutor's statement during closing arguments amounted to prosecutorial misconduct, which infringed upon his substantive rights and requires reversal of his conviction. *Id.* at 45.

[25]     We reject each of Santos's arguments. In doing so, we note several deficiencies in the trial court's development of the record and application of the legal standards set by the Guam Rules of Evidence and the precedent of this court. However, we hold that the trial court did not commit clear and obvious error that prejudiced Santos.

**A. The Trial Court Did Not Abuse Its Discretion in Certifying Nurse Rios as an Expert and Admitting Her Testimony Under GRE 702**

[26]     Santos argues that the trial court abused its discretion in admitting Nurse Rios's testimony. First, Santos argues that the evidence did not establish that Rios was qualified to be an expert in sexual assault nurse examination by knowledge, skill, training, or education and that the trial court did not make findings to this effect. Appellant's Br. at 29–31. Next, Santos argues that because Rios testified that the genital examination she performed on S.A. revealed no physical injuries or evidence of penetration, it was inconclusive and therefore would not help the trier of fact as required by GRE 702. *Id.* at 31–32. Finally, Santos asserts that Rios's testimony about two scholarly articles was inadmissible hearsay. *Id.* at 32.

**1. Nurse Rios was qualified to testify as an expert under GRE 702**

[27]     Nurse Rios testified as an expert witness for the People. During the People's direct examination of Rios, defense counsel objected to Rios's certification as an expert in sexual assault nurse examination, stating, "I don't think there is such a thing as sexual assault nurse examiners . . . . I think she can be labeled as an expert in nursing . . . ." Tr. at 42 (Jury Trial, Apr. 30, 2019). On appeal, Santos merely argues that the evidence did not establish that Rios was qualified in the field of sexual assault nurse examination, despite Rios's testimony she had previous relevant

education in nursing, certification as a SANE, and work experience as a SANE. Appellant's Br. at 30–31. We disagree.

**[28]**     Under GRE 702, an expert may present opinion testimony. GRE 702 states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Guam R. Evid. 702. The Guam Rules of Evidence are essentially identical to its like-numbered counterparts in the Federal Rules of Evidence. *See People v. Jesus*, 2009 Guam 2 ¶ 32 n.8. This court has held that "[g]enerally, when a legislature adopts a statute which is identical or similar to one in effect in another jurisdiction, it is presumed that the adopting jurisdiction applies the construction placed on the statute by the originating jurisdiction." *Sumitomo Constr. Co. v. Zhong Ye, Inc.*, 1997 Guam 8 ¶ 7. The Supreme Court of the United States has recognized that the trial court's general "gatekeeping" obligation applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Additionally, the Supreme Court of Arizona has held that, in adopting the language of Federal Rule of Evidence 702, the role of the trial court is to "serve as the 'gatekeepers' of admissibility for expert testimony, with the aim of ensuring such testimony is reliable and helpful to the jury." *State v. Romero*, 365 P.3d 358, 361 (Ariz. 2016) (citing Ariz. R. Evid. 702, cmt. (2012)). This court also charges the trial courts of Guam with this gatekeeping function as it applies to qualifying experts and admitting expert testimony.

**[29]**     While the trial court is not typically required to make findings when ruling on the admissibility of evidence, the better practice is to make at least some findings setting forth the

rationale used in deciding the admissibility of proffered expert evidence that is challenged. A trial judge should strive to ensure a proper record is developed in resolving challenges to proffered expert evidence, which includes the analysis and rationale applied by the court. Further, the trial court's analysis should reflect proper consideration of the factors required by GRE 702, a finding of relevancy, and balancing under GRE 403. We agree with the sentiment of the First Circuit that there are few circumstances "in which an appellate court would venture to superimpose a *Daubert* ruling on a cold, poorly developed record when neither the parties nor the nisi prius court has had a meaningful opportunity to mull the question." *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 189 (1st Cir. 1997) (finding trial court record inadequate to undertake *Daubert* analysis where record neither reflected a citation to *Daubert* nor a statement of trial court's purposes in excluding expert evidence).

[30]      This court has entertained challenges to expert testimony provided by sexual assault nurse examiners in previous sexual assault cases but has not yet been asked to determine whether a SANE is an expert within the meaning of GRE 702. *See, e.g.*, *People v. Mendiola*, 2014 Guam 17 ¶ 25 (testimony of SANE regarding victim's medical history and genital examination contributed to satisfying burden of proving element of penetration for First Degree CSC); *People v. Camacho*, 2016 Guam 37 ¶ 47 (testimony of SANE regarding victim's medical history relating to sexual assault and results of victim's genital exam, specifically as to element of penetration, was sufficient to sustain conviction of First Degree CSC when presented alongside testimony of penetration presented by social worker who interviewed victim). Other jurisdictions have concluded that SANEs are experts in certain circumstances under their local version of Rule 702 of the Federal Rules of Evidence. *See, e.g.*, *Young v. State*, 106 So. 3d 775, 780-81 (Miss. 2012) (SANE recognized as expert having sixteen years of experience as sexual assault nurse examiner, 32 years

of experience as registered nurse, several degrees in general nursing, and having conducted thousands of genital examinations in her career); *Wakeman v. Commonwealth*, 838 S.E.2d 732, 733 (Va. 2020) (nurse who had completed training to become a SANE but had no formal SANE certificate was qualified as expert after performing three years of forensic nursing examinations).

[31]     On direct examination and at the beginning of her testimony, Rios testified that she received a Bachelor of Science in Nursing from the University of Guam, a certificate as a Sexual Assault Nurse Examiner for Pediatric Patients and, later, a second certificate as a Sexual Assault Nurse Examiner for Adults and Adolescents.  Rios testified that she worked as a SANE nurse since at least February 2018.  She testified that she was formerly a full-time SANE nurse, but recently took a job as a health counselor at an elementary school and now works part-time as a SANE nurse. After this testimony, the People moved to have Rios certified as an expert in sexual assault nurse examination.  Later, on further examination by the People, Rios testified that she has performed over 350 examinations.

[32]     The trial court did not err in finding that Nurse Rios was qualified to provide expert testimony as to sexual assault nurse examinations because her expertise was supported by sufficient knowledge, skill, training, or education.  At the time of certification, the People had established that Rios had general nursing education, certifications as a Sexual Assault Nurse Examiner in two different areas, including teenagers, and at least some work experience as a SANE.  Rios was also testifying about an examination she had performed herself in her professional capacity.[4]

---

[4] The trial court did not, however, make any findings relating to Nurse Rios's qualifications on the record.

### 2. Nurse Rios's testimony qualified as expert testimony under GRE 702

[33]     Santos asserts that Rios's testimony did not help the trier of fact because Rios did not find injuries or trauma during S.A.'s genital examination and that Rios testified this was not dispositive of the question of whether penetration had occurred. Appellant's Br. at 31–32. We disagree. We find that Rios's testimony helped explain Rios's conclusion and address defense counsel's statements about the lack of injury to S.A.'s hymen after digital penetration.

[34]     "[A]nalysis of a Rule 702 issue encompasses a two-part test: (1) whether the witness is qualified via knowledge, skill, experience, training, or education and (2) whether the witness' testimony will assist the trier of fact." *Roten*, 2012 Guam 3 ¶ 30 (emphasis omitted) (quoting *In re N.A.*, 2001 Guam 7 ¶ 44). Other jurisdictions have found the testimony of SANEs to be helpful to the trier of fact in explaining the lack of injuries in sexual assault cases. *See*, *e.g.*, *Young*, 106 So. 3d at 780 (SANE testimony on ability of hymen to heal itself assisted jury); *People v. Brown*, 926 N.W.2d 879, 887 (Mich. Ct. App. 2018) (SANE testimony on lack of injury in most sexual assault cases was properly admitted as it was based on SANE's specialized knowledge and helped jury understand evidence); *Strickland v. State*, 378 S.W.3d 157, 161 (Ark. Ct. App. 2010) (SANE testimony was useful to explain to jury why absence of physical evidence did not necessarily mean that victim had not suffered sexual abuse).

[35]     In opening statements, defense counsel stated that if Santos digitally penetrated S.A. multiple times over six years, it would be extremely unlikely that S.A.'s hymen would be intact. Defense counsel stated that the People would introduce expert witness testimony that a hymen may regrow and alluded to the impossibility of a hymen being unbroken after several incidents of digital penetration. On appeal, Santos insists that Rios's examination of S.A. was "inconclusive" and could not be useful to the trier of fact. Appellant's Br. at 25–26.

[36]     In the People's case-in-chief, Rios testified that during a genital examination, she examines the shape of the hymen for signs of tearing or scarring.  Rios testified she did not expect to find any tearing or scarring in S.A.'s examination because of S.A.'s description of the event.  When asked whether the lack of injuries led Rios to a specific conclusion, Rios replied that "it doesn't confirm nor does it deny that anything happened to her."  Tr. at 48 (Jury Trial, Apr. 30, 2019). The People asked Rios whether there was any literature that would help the jury understand her conclusion, to which Rios referred to the Markowitz study, which calculated the percentage of examinations which revealed injuries in sexual assault cases.

[37]     The trial court overruled defense counsel's objection that such a study was outside Rios's field of expertise and that she did not possess the education and background to discuss the study. Rios also discussed the Kellogg study, which found evidence of intact hymens in teenagers who had gotten pregnant and had given birth, suggesting that a hymen can appear to have no physical injuries even after giving birth.  Rios later testified on re-cross examination that she uses the Kellogg study to explain "penetration," presumably while providing expert testimony.  *Id.* at 81.

[38]     The trial court did not err in finding that Rios's testimony was useful to the trier of fact. Rios's expert testimony would assist the trier of fact to better understand Rios's lack of findings during S.A.'s genital exam.  This evidence would aid the jury's understanding of the importance of physical injuries in a case of alleged penetration, particularly as defense counsel had used his opening statement to cast doubt on the probability of a hymen being uninjured after digital penetration and the inability of the hymen to heal.  The evidence presented by Rios was particularly relevant because the physical examination of S.A. was not conducted until a month after the reported incident of digital penetration, which Rios testified could explain a lack of injuries.  Rios had the appropriate expertise to review and testify to the content of the journal articles.  Her

education and training involved the observation and detection of injuries to the genitals relating to penetration, and these journal articles reviewed the prevalence of such injuries in sexual assault cases and explain the lack of injuries sometimes found in those cases.

### 3. Nurse Rios's testimony on the two scholarly articles fell within the learned treatise hearsay exception of GRE 803(18)

[39]    Santos argues that Nurse Rios's testimony on the articles was not based on her own personal knowledge, skill, training, or education to offer expert testimony, but instead, that Rios "simply paraphrased hearsay information from third parties who themselves were not certified as experts by the trial court, nor were the materials testified to authenticated." Appellant's Br. at 32. Defense counsel objected to the admission of three pages of the Kellogg study to which Rios referred during her testimony.

[40]    "Hearsay is not admissible except as provided by the laws of Guam, by these rules or by other rules prescribed by the Supreme Court of Guam pursuant to statutory authority." Guam R. Evid. 802. Hearsay is defined as:

> (a) Statement.  A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.
>
> (b) Declarant.  A "declarant" is a person who makes a statement.
>
> (c) Hearsay.  "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

GRE 801(a)-(c).  Under Guam law, certain statements that would otherwise be hearsay fall under the "learned treatise" exception:

> (18) Learned treatises.  To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony

> or by judicial notice. If admitted, the statements may be read into evidence but may
> not be received as exhibits.

Guam R. Evid. 803(18).

[41]    Rios, as an expert in sexual assault nurse examination, was an expert witness under Rule

803(18). The articles themselves were within the purview of Rios's expertise. However, the

statements in the articles were not those of Rios herself but of the authors of the respective articles

and are therefore hearsay. Prior to the evidence being admitted, neither the People nor the trial

court explicitly cited a relevant hearsay exception under which the testimony may be admitted.

The People failed to establish the reliability and authority of the articles through Rios's testimony

until after she testified to the substance of the articles. On direct examination, the People asked

Rios whether there was any literature or journal articles she reviewed that would "help us

understand the situation" relating to Rios's testimony that a sexual assault could still have occurred

despite the lack of physical injuries during S.A.'s genital examination. Tr. at 48–49 (Jury Trial,

Apr. 30, 2019). Only on further examination did the People elicit testimony from Rios as to

whether she knew the identity and reputation of the journal in which the Kellogg study was

published. However, Rios testified to the authority and reliability of the Markowitz study, stating

that Jennifer Markowitz, the author, was an expert in the field and the study was a review of other

published studies. Rios testified to the authority and reliability of the Kellogg study on cross-

examination, but only after she had testified to its substance and findings. As Rios was qualified

to testify to the authenticity and reliability of the two articles, the trial court did not err in admitting

the testimony.[5]

---

[5] The trial court erred in admitting portions of the Kellogg study into evidence, which was later remedied through a jury instruction. The People sought to admit three pages of the Kellogg study, which were ultimately admitted over defense counsel's hearsay objection. The trial court erred in admitting this evidence as People's Exhibit 5. Rule 803(18) clearly states that "[i]f admitted, the statements may be read into evidence but may not be received

**[42]**     Though we find today that the trial court did not commit error by admitting the testimony relating to the two articles, we admonish the trial court for not first conducting an inquiry into the relevancy and reliability of the articles prior to the expert's testimony and the admission of portions of the articles into evidence. The better practice is for the trial court to require a proffer of the expert testimony and rule on its admissibility before its presentation to the jury.[6] We also note several deficiencies in the trial court's development of the record. The trial court did not make findings on the reliability or authority of the articles before Nurse Rios testified to their substance, nor did the trial court take notice of the articles. Although the trial court did not commit clear and obvious error that prejudiced Santos, the court is rebuked for the several deficiencies in the trial court's development of the record and application of the legal standards set by the Guam Rules of Evidence and the precedent of this court.

## B. The Trial Court Did Not Commit Plain Error in Admitting Testimony of Prior Incidents of Uncharged Sexual Conduct Under GRE 413

**[43]**     Santos argues that the trial court's admission of S.A.'s testimony on uncharged past incidents of sexual assault by Santos was an abuse of discretion and plain error. Appellant's Br. at 47. Santos states that the court did not apply GRE 402, 403, or 404 before admitting the testimony, and also failed to apply the three-part test for admitting evidence under GRE 413 as adopted in *Chinel*. *Id.* at 48–49.

**[44]**     For the reasons set forth below, we find that the trial court erred in failing to perform a "searching inquiry" as required by our decision in *Chinel* and in failing to perform the balancing under GRE 403, but that Santos suffered no prejudice as a result of these errors.

---

as exhibits." Guam R. Evid. 803(18). However, the trial court provided a jury instruction that the jury was only to consider the expert testimony about the article and was not to be provided with a copy of the article itself.

[6] Defense counsel may not have been provided the three-page excerpt of the Kellogg study with sufficient time to read and consider its consequences. *See* Tr. at 73-74 (Jury Trial, Apr. 30, 2019).

**1. The trial court erred by failing to perform the "searching inquiry" required by *Chinel* and the balancing under GRE 403 before admitting the evidence of prior incidents of uncharged sexual conduct**

[45]    Before evidence of other criminal sexual conduct may be admitted under GRE 413, the trial court must ensure compliance with the three *Chinel* factors, the balancing required under GRE 403, and any other relevant rule of evidence.

[46]    "In a criminal case in which the defendant is accused of an offense of criminal sexual conduct, evidence of the defendant's commission of another offense or offenses of criminal sexual conduct is admissible, and may be considered for its bearing on any matter to which it is relevant." Guam R. Evid. 413(a).  GRE 413 specifies that an "offense of criminal sexual conduct" includes a crime under federal law, Guam law, or the law of a state that involved "contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person." Guam R. Evid. 413(d)(3).  This court employs a three-part test to determine the admissibility of evidence under GRE 413:

> First, the defendant in the present case must be accused of sexual assault.  Second, the evidence proffered must be evidence of the defendant's commission of another past act of sexual assault.  Third, the past act must be relevant, meaning that its existence must make any fact at issue more or less probable than if such evidence were excluded.

*Chinel*, 2013 Guam 24 ¶ 25 (citing *United States v. Guardia*, 135 F.3d 1326, 1328 (10th Cir. 1998)).

[47]    GRE 413, by its own terms, "shall not be construed to limit the admission or consideration of evidence under any other rule."  Guam R. Evid. 413(c).  Thus, evidence admitted under GRE 413 should also be balanced under GRE 403. *See Chinel*, 2013 Guam 24 ¶ 30 (evidence otherwise admissible under GRE 413 "may still be deemed inadmissible for violating GRE 403").

**[48]**     In *Chinel*, we adopted the test applied by the Ninth Circuit in *United States v. LeMay*, 260 F.3d 1018, 1027–28 (9th Cir. 2001), to analyze the relevance and balance the potential prejudice of admitting prior uncharged sexual conduct under GRE 403.  *See Chinel*, 2013 Guam 24 ¶ 39. Using the *LeMay* factors as a guide, the trial court should examine:

> (1) the similarity of the prior acts to the acts charged; (2) the closeness in time of the prior acts to the acts charged; (3) the frequency of the prior acts; (4) the presence or lack of intervening circumstances; and (5) the necessity of the evidence beyond the testimonies already offered at trial.

*Chinel*, 2013 Guam 24 ¶ 39 (citing *LeMay*, 260 F.3d at 1028).  Foremost, the reviewing court "must be satisfied that the trial courts conducted a *searching inquiry* citing any *LeMay* factors particularly relevant to the case, discussing any other factors that may be relevant, and considering both the amount of unfair prejudice and probative value in making determinations." *Id.* (emphasis added).  The searching inquiry ensures that the trial court admits only "alleged misconduct [that] is sufficiently similar to the acts charged."  *See People v. Ehlert*, 2019 Guam 3 ¶ 30.  The list of *LeMay* factors is not intended to be exhaustive or mandatory, and the trial courts retain flexibility to consider other factors relevant to the cases before them or ignore any *LeMay* factors that are irrelevant.  *Chinel*, 2013 Guam 24 ¶ 39.  Importantly, a limiting instruction to the jury about evidence of prior uncharged sexual conduct alone does not excuse the trial court from conducting a searching inquiry or cure a failure to make such an inquiry.  *People v. Camaddu*, 2015 Guam 2 ¶ 20.

**[49]**     We have considered what constitutes a "searching inquiry" under *Chinel*.  In *Ehlert*, we found that the trial court "plainly analyzed" the similarities between the testifying victim's account and the conduct charged in the indictment.  2019 Guam 3 ¶ 29.  The trial court specified for what purposes the victim's account could be used and excluded certain parts of the account which fell outside the definition of sexual contact under GRE 413.  *Id.*  We found that this analysis met the

searching inquiry standard adopted by the court. *Id.* In contrast, we held in *Camaddu* that the trial court abused its discretion in admitting evidence under GRE 413 by failing to conduct a searching inquiry into the relevancy of the alleged misconduct and the acts charged or to engage in balancing under GRE 403. 2015 Guam 2 ¶ 81.

[50]    First, we address the trial court's error in failing to apply the *Chinel* factors. In the proceeding below, the trial court made no findings relating to the three *Chinel* factors before S.A.'s testimony about the alleged previous sexual assaults by Santos. We note that, after S.A.'s testimony, the parties approached the bench to inform the court of the prior agreement to allow the prosecutor to elicit S.A.'s testimony on this matter without defense counsel's objection. The parties executed a written stipulation filed the next day, stipulating that "[t]he Jury has heard evidence of uncharged conduct" and "[t]he Parties agree that that [sic] the evidence was properly admitted under GRE Rule 413." RA, tab 45 (Stipulation on Law, May 3, 2019). The written stipulation did not state that the evidence was also properly admitted under GRE 403. Despite the stipulation, the trial court erred by failing to apply the three *Chinel* factors before S.A.'s testimony.[7]

[51]    The trial court committed a second error by failing to perform a searching inquiry into the relevancy and potential for prejudice required by *Chinel* and GRE 403. The written stipulation did not relieve the trial court from conducting these inquiries, as the parties never stipulated to the relevancy or the admissibility of the testimony under GRE 403. *See* RA, tab 45 (Stipulation on Law). The record reflects no analysis or findings by the trial court under *Chinel* or GRE 403.

---

[7] The trial court erred regardless of the testimony satisfying the three *Chinel* factors. First, Santos was charged with First Degree CSC and Second Degree CSC. Second, S.A. testified that for many years, Santos had digitally penetrated her while she was asleep and staying at his home. Though S.A. did not testify to the specifics of the prior incidents, the charged offense was sufficiently similar to what S.A. described in her testimony. Third, the testimony S.A. offered was relevant because S.A. alleged a pattern of sexual abuse. While the trial court may have observed this, there is no reflection of this in the record.

While the trial court did not have to make specific findings using the *LeMay* factors, the trial court did have to create a record whereby its analysis was sufficiently developed.

[52]     We also find that the trial court's jury instructions relating to the GRE 413 testimony were deficient, though not strictly in error. The jury instructions contained no specific instruction as to the testimony relating to prior uncharged sexual misconduct or evidence admitted under GRE 413.[8] We have held that when a defendant objects to the jury instructions relating to evidence admitted under GRE 413, a more substantial jury instruction is required. *See Ehlert*, 2019 Guam 3 ¶ 33. However, unlike in *Ehlert*, Santos's defense counsel advocated against the People's request to instruct the jury specifically about the prior uncharged sexual conduct, stating, "We don't want [the stipulation of law regarding GRE 413] read to the jury. We want . . . normal jury instructions." Tr. at 86 (Jury Trial, May 2, 2019). As Santos did not object to the jury instructions relating to evidence admitted under GRE 413, we find the trial court did not err by not providing a more specific instruction.

### 2.  The trial court's errors did not affect Santos's substantial rights

[53]     To find plain error, the defendant must show that (1) there was an error; (2) the error was clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is required to prevent a miscarriage of justice or to maintain the integrity of the judicial process. *Mendiola*, 2010 Guam 5 ¶ 14 (citing *Quitugua*, 2009 Guam 10 ¶ 11).

[54]     The trial court committed error by failing to conduct the "searching inquiry" and GRE 403 balancing as *Chinel* requires. The trial court also erred by not performing the GRE 403 balancing before the GRE 413 evidence was heard by the jury. However, these errors did not affect Santos's

---

[8] The jury instructions contained several, more general provisions. The jury instructions provided, "The testimony of a victim need not be corroborated in prosecutions of criminal sexual conduct." Tr. at 87 (Jury Trial, May 6, 2019). The jury instructions also provided, "The defendant is on trial for the crimes charged not for any other activity." *Id.* at 89.

substantial rights. First, defense counsel acknowledged that the defense had received prior notification of the People's intent to have S.A. testify about the prior incidents of sexual conduct perpetrated by Santos. Before opening statements, defense counsel told the prosecutor he planned to use the testimony as evidence and that he agreed not to object to the People's use of the evidence. Second, S.A.'s testimony about the prior incidents did not constitute a substantial portion of her testimony. S.A. testified extensively across two days of trial. S.A. testified in detail about the charged incident. S.A.'s testimony alone is sufficient to support a conviction for criminal sexual conduct. *See Perez*, 2015 Guam 10 ¶ 36 ("[T]he testimony of a sexual assault victim does not need to be corroborated, and a victim's testimony alone can support a criminal sexual conduct conviction."). The People asked only four questions relating to the prior incidents, and S.A.'s responses provided minimal detail.

[55] The trial court's errors in the admission of S.A.'s testimony did not affect Santos's substantial rights and do not amount to plain error. Santos had prior notice of the People's plan to elicit S.A.'s testimony about the prior incidents, and defense counsel made a tactical decision of trial strategy to allow the introduction of the evidence. Further, defense counsel failed to object to the prosecutor's questioning and later stipulated to the admissibility of the testimony under GRE 413.

[56] Because we hold that Santos's substantial rights were not affected, we need not address the fourth element of the plain error test—namely, whether reversal is required to prevent a miscarriage of justice or to maintain the integrity of the judicial process.

## C. Santos Waived His Right to Appeal the Trial Court's Decision to Deny the People's Motion for Mistrial

[57] Santos argues the trial court abused its discretion by denying the People's motion for mistrial based on manifest necessity created by an outburst by S.A. in the presence of the jury.

Appellant's Br. at 39.  At trial, defense counsel advocated *against* a grant of mistrial.  The trial court also took immediate corrective measures by admonishing the witness and instructing the jury to disregard the outburst.  We find that Santos waived his right to appeal the trial court's denial of the People's motion for mistrial, and we decline to review the trial court's decision.

[58]    Title 8 GCA § 130.50(b), the "Plain Error Rule," stems from Federal Rule of Criminal Procedure 52(b) prior to its amendment in 2002.[9]  Thus, federal court interpretation of Rule 52(b) is persuasive authority.  *See People v. Felder*, 2012 Guam 8 ¶¶ 26, 31.

[59]    Whether Santos waived his right to appeal any error made by the trial court in its decision to deny the motion for mistrial is a threshold issue.  The United States Supreme Court held in *United States v. Olano*, 507 U.S. 725 (1993), that "[d]eviation from a legal rule is 'error' unless the rule has been waived."  507 U.S. at 732–33.  "If a legal rule was violated during the [trial] court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) despite the absence of a timely objection."  *Id.* at 733–34.  To find waiver, there must have been an "intentional relinquishment or abandonment of a known right," while forfeiture is merely failing to "make the timely assertion of a right."  *Chong*, 2019 Guam 30 ¶ 9 (quoting *Olano*, 507 U.S. at 733).  Whereas waiver precludes appellate review, forfeiture is subject to plain error review.  *Id.*

[60]    During a break in the defense's cross-examination of S.A., S.A. made a profane outburst directed toward either the defendant or defense counsel in the presence of the jury.  The prosecutor approached the bench following the break to inform the trial court of the outburst and requested a

---

[9] Rule 52(b) was amended by deleting the words "or defect" after the words "plain error."  Fed. R. Crim. P. 52(b).

mistrial based on manifest necessity.[10]  Santos's trial counsel disagreed, stating, "I will not argue what she said, in closing, off the record, from the jury. . . .  [The jury] can decide what she said on the record. . . .  I think the instruction [to only consider what is on the record] is fine."  Tr. at 64 (Jury Trial, May 2, 2019).  Defense counsel also stated that S.A.'s outburst was the People's "problem."  *Id.*  Ultimately, the trial court did not order a mistrial.

[61]     Defense counsel made the strategic decision to oppose the People's motion for mistrial; he did not merely fail to object to the motion and preserve the claim of error for later appeal.  We find that Santos intentionally abandoned his right to appeal the denial of the motion for mistrial based on manifest necessity created by S.A.'s outburst, and we will not review his argument on the trial court's alleged error.

## D.  The People's Comments During Closing Arguments Did Not Amount to Prosecutorial Misconduct

[62]     Santos argues that the People's reference to Santos's lack of alibi during closing arguments amounted to prosecutorial misconduct which violated Santos's Fifth Amendment, Organic Act, and other statutory rights.  Appellant's Br. at 45.  The People argue that the prosecutor's comments on Santos's lack of alibi were harmless.  Appellee's Br. at 17–18 (July 14, 2020).  The People also assert that the comments should be reviewed for plain error because Santos failed to object to the comments during trial.  *Id.* at 17.  As a threshold issue, we find that the prosecutor's comments were not improper, and we need not analyze the comments for error.

[63]     When addressing claims of prosecutorial misconduct, we must first determine whether the challenged statements were improper.  *People v. Blas*, 2015 Guam 30 ¶ 30 (citation omitted).  An

---

[10]  The Prosecutor stated, "The judge did not hear [the outburst], because the judge was already off the bench. I have some concerns about that. I think it may warrant a mistrial. If we look at United States v. Perez, 22 U.S. 579, the standard for that is manifest necessity.  When the jury goes back to deliberate, even if the court does – strikes the – whatever they heard, even if we eliminate instruction [sic], all they're going to hear is those words that was [sic] not on the record… ."  Tr. at 62 (Jury Trial, May 2, 2019).

improper argument is not a *per se* violation of a defendant's constitutional rights. *Id.* For prosecutorial misconduct to rise to the level of a constitutional violation, the prosecutor's comments must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Id.* (quoting *People v. Evaristo*, 1999 Guam 22 ¶ 20).

[64]     "It is improper for the prosecution to 'suggest that the defendant has the burden to produce evidence.'" *Id.* ¶ 31 (quoting *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996), *as amended* (Aug. 16, 1996)). We have noted that "several jurisdictions hold that it is allowable for the prosecution to comment upon the failure of the defense to offer evidence in support of its case." *Id.* (citing *Orellana v. State*, 381 S.W.3d 645, 655 (Tex. App. 2012)). Further, the U.S. Supreme Court has held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). At least one jurisdiction has found that "the *Griffin* rule forbids any reference to a defendant's failure to take the stand in his defense, but 'that rule does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses.'" *People v. Ratliff*, 715 P.2d 665, 674 (Cal. 1986) (per curiam) (quoting *People v. Szeto*, 623 P.2d 213, 221 (Cal. 1981)).

[65]     In *Ratliff*, the California Supreme Court found no violation of the defendant's Fifth Amendment rights when the prosecutor remarked on the failure of the defense to present any evidence, including alibi testimony, to show that the defendant did not commit the charged offenses. *Id.* at 673. The California court found that "[n]one of the prosecutor's remarks suggested that defendant had a burden of proof which he failed to carry, and the court's jury instructions confirmed that the People had the entire burden of establishing defendant's guilt." *Id.* at 674.

Further, the court held that the prosecutor's statements did not diminish the defendant's constitutional right to remain silent. *Id.* at 673–74.

[66]     The People in this case began their closing argument by stating, "Motive, opportunity, lack of alibi, and corroboration. Those are the things the criminal justice system wants." Tr. at 11 (Jury Trial, May 6, 2019). The prosecutor made one other remark relating to Santos's lack of alibi, stating, "[Santos] wasn't with another person. No one testified that they were with the defendant at that time period, he was alone, until it became [sic] with [S.A.]." *Id.* at 12. The defense did not object to these statements. Defense counsel even rebutted this in closing arguments, stating, "[The prosecutor] says [Santos] has no alibi, I did not bring up alibi as a defense, but [Santos's] statement clearly says he was laying by [S.A.'s mother] until he walked outside." *Id.* at 37. The defense continued:

> I have a different approach for you. [S.A.'s] laying in bed, mad about something, she's not getting enough attention from home, and when [Santos] walks outside, and she can hear him walking outside -- or not walking outside, walking through the house, she runs [to her mother's room] and accuses him of something.

*Id.*

[67]     The prosecutor's comments were not improper as they related to the state of the evidence presented by Santos; thus, there was no prosecutorial misconduct to review for prejudicial effect. Those statements did not shift the burden of proof to the defense. Rather, the People summarized that "[a]ll the elements in this case have been met beyond a reasonable doubt by the testimony of [S.A.] and the other witnesses." Tr. at 20 (Jury Trial, May 6, 2019). The People did not comment on either Santos's failure to testify in his own defense or on his failure to produce an alibi defense or corroboration of the claim in his written statement to the police that he was alone at the time of the incident. The record is sufficiently clear that the prosecution's comments pertained to the state

of the evidence and did not relate to Santos's decision not to testify. Accordingly, we find that the comments were not improper and, thus, there is no prosecutorial misconduct to review.

## V. CONCLUSION

[68] The trial court did not abuse its discretion in qualifying Nurse Rios as an expert in sexual assault nurse examination or in admitting her testimony on the genital exam she performed on S.A. and her testimony about the two scholarly articles.

[69] The trial court erred by failing to apply the *Chinel* factors, conduct the searching inquiry required by *Chinel*, and perform the balancing under GRE 403 before admitting S.A.'s testimony about prior uncharged incidents of sexual conduct committed by Santos against her. As Santos did not preserve the error by objecting in the court below, we review for plain error. On plain error review, we find that Santos failed to show the trial court's error violated his substantial rights. As a result, we need not address the fourth element of the plain error test when there has been no injury to Santos's substantial rights.

[70] Santos intentionally waived his right to appeal the trial court's denial of the People's motion for mistrial based on manifest necessity. We find that when Santos's trial counsel declined to object to the trial court's denial of the motion and instead advocated against the motion, Santos made an intentional waiver of his right to appeal any error in failing to grant the People's motion. Accordingly, the trial court's decision is precluded from review.

//

//

//

//

//

**[71]** Finally, we find no prosecutorial misconduct in the People's comments relating to the lack of alibi evidence produced by Santos. Comments relating to the state of evidence produced by a defendant are proper under current law. Therefore, we need not review these comments for prejudicial effect. For these reasons, we **AFFIRM** the judgment of conviction.

|  |  |
|---|---|
| /s/ | /s/ |
| ROBERT J. TORRES | KATHERINE A. MARAMAN |
| Associate Justice | Associate Justice |

/s/
F. PHILIP CARBULLIDO
Chief Justice